EDITH HOLLAND, Respondent, v. MISSOURI PA-
CIFIC RAILROAD COMPANY, Appellant.*

Springfield Court of Appeals, January 7, 1924. ·

1. **RAILROADS: Company Liable for Injury by Horse Frightened by
Unusual Noises: Whether Driver Unnecessarily Jumped from Buggy,
Question for the Jury.**  Where plaintiff's horse was frightened from
unusual noises negligently caused by defendant's agents in charge
of the locomotive, and got beyond control of plaintiff, and she was
thrown from the buggy and injured, she can recover, though the
horse did not "run away" as that expression is usually understood,
and whether the plaintiff jumped out of the buggy without cause,
or was thrown out, was a question for the jury.

2. ——: **Negligent Frightening of Horse Held for Jury.**  Evidence
in action for injury from frightening of plaintiff's horse, *held* suffi-
cient to go to the jury on the question of unusual noise negligently
caused by defendant's engineer letting off steam from the cylinder
cocks of the locomotive.

3. **APPEAL AND ERROR: Party Cannot Complain of Opponent's In-
struction as Indefinite, Where His Own is no More Definite.**  De-
fendant cannot complain of plaintiff's instruction as indefinite as
to the noise which would allow recovery, when its own instruction
on the same subject is no more definite, because it has accepted or
adopted the same theory, and the jury will not be considered to
have been misled by plaintiff's indefinite instruction, because the
noise complained of in the evidence of plaintiff was from escaping
steam down at the cylinder cocks, not from whistle or exhaust.

4. **DAMAGES: $5000 for Crushed Ankle and Broken Ribs, Verdict
Excessive by $1500.**  Verdict of $5000 for crushed ankle and three
broken ribs of a married woman, fifty-seven years old, little ap-
pearing in the record as to physical suffering, and the evidence as
to the permanency of the injury not being definite, *held* excessive
by $1500.

*Headnote 1.  Railroads, 33 Cyc. pp. 1151, 1158; 2.  Railroads.
33 Cyc. p. 1158; 3.  Appeal and Error, 4 C. J. section 2620; 4.  Dam-
ages, 17 C. J. section 408.

Appeal from Circuit Court of Butler County.—*Hon. Al-
mon Ing*, Judge.

AFFIRMED (*on condition*).

*J. F. Green* and *J. C. Sheppard* for appellant.

(a) The court erred in giving to the jury instruction No. 1 at the request of the respondent, for the reason that it is broader than the evidence, and permits the jury to find for her if they find and believe from the evidence that the exhaust from the locomotive caused her horse to become frightened and run away, there being a complete failure of proof that the exhaust is an unusual noise, or that it is unnecessary in the operation of the engine; and for the further reason that respondent and her daughter testified that the noise came from the front of the engine near the ground and was produced by escaping steam. So that, the instruction is not limited by the proof and is prejudicial error. Turner v. Baker, 42 Mo. 13; Franz v. Hiltebrand, 45 Mo. 121; Musick v. Atlantic & Pacific Ry. Co., 57 Mo. 134; Carey v. St. L., K. C. & N. Ry. Co., 60 Mo. 209; Champion Coated Paper Co. v. Shilkee, 237 S. W. 109; Holden v. Mo. R. R. Co., 177 Mo. 456; Boles v. Dunham, 208 S. W. 480, and cases cited.

*R. I. Cope* and *Sam M. Phillips* for respondent.

(a) When one is placed in a position of peril by the negligence of another, his attempt to escape danger even by doing an act which is also dangerous, and from which injuries resulted, will not prevent a recovery. Nelson v. Railroad, 58 Mo. 593; Twonley v. Railroad, 69 N. Y. 158; Buel v. Railroad, 31 N. Y. 314. (b) And the foregoing rule is true, even though the person would not have been injured at all had he not made the attempt to escape the threatened danger. Twonley v. Railroad, 69 N. Y. 158; Buell v. Railroad, 31 N. Y. 314; Railroad v. Mowery, 36 Ohio State 418; Wilson v. Railroad, 26 Minn. 276; Smith v. Railroad, 30 Minn. 169; Stultz v. Railroad, 44 Wis. 638; Gunz v. Railroad, 66 Wis. 672; Railroad v. Rhodes, 56 Ga. 645.

BRADLEY, J.—Plaintiff sued to recover for personal injuries. The cause was tried to a jury, and plain-

tiff obtained a judgment for $5000. Failing to obtain a new trial defendant appealed.

Immediately south of Poplar Bluff defendant's railroad runs practically north and south. The public road, known as the Pike Slough road, parallels the railroad on the east side, and within fifteen or twenty feet thereof. Plaintiff with her daughter was in a buggy traveling south on the Pike Slough road alongside the railroad. She alleges that an engine approached her from the rear and was so carelessly managed and controlled as to suddenly, and without warning, make a loud, unusual and terrifying noise by emitting a great quantity of steam, thereby causing her horse to run away and throw her from the buggy and severely injure her. Defendant answered by a general denial.

Defendant challenges the sufficiency of the evidence, an instruction, and contends that the verdict is excessive.

Minnie Holland, plaintiff's daughter, testified as follows:

"The first time I saw the engine down there we were on the Pike Slough road. The engine blew off steam from the bottom and sides, up near the cow catcher where the two little wheels are. The first noise wasn't so very loud, the second time it got louder. At that time we were on the part of the road which ran by the side of the track. Then the horse got scared and started to run, ran about a hundred yards, or feet. At that point the road was pretty close to the railroad track, about as far as across this room. I saw the men on the engine. My mother just pulled on the bridle to stop the horse. We went on down the road, and that engine backed up then, in the meantime we were trying to stop the horse. The engine then backed up, while we were just about to Irby's store the engine caught up with us and blew steam louder, from down at the sides, made a loud noise, and the horse jumped on one side and ran away, for a good ways; but kept straight in the road, and made a turn; and when he made this turn my mother fell out of the buggy. I did not hear the engine whistle or anything like that, just made these

noises, letting this steam out. It just ran up there and shot out this steam. After my mother fell out of the buggy, I fell out, too. I stopped the horse, after I fell. I just jumped up and ran after him; ran a good ways, and then went back to my mother. I found her at Irby's store. She got her ribs broken and her ankle crushed."

On cross-examination this witness testified:

"We had just come from home and were going back home. We had been to town. This happened in the afternoon, I don't know just when, about one or two o'clock. We were going south past the houses of the colored people when we first saw this engine, had just got past those houses when we first saw it. At that point the road goes west and then turns south. The engine was coming behind us when I first saw it. Say this is the corner now, the road comes down this way, and then comes down the Pike Slough road. When we turned the corner here, and started south, the engine was up the track further north, I don't know how far. It had no cars attached to it, just an engine by itself. The pilot was pointed south. It went right on kept up with us. We went right along by the side of it, for about a hundred yards, or something. The horse kind of scared then at the engine which was blowing steam which came out from the side of the engine, the side we were on, and toward the front end of the engine, the end further south. I am sure the cowcatcher was pointed south, and the engine did not have any cars attached to it. It didn't sound very loud the first time; but the next time it sounded louder, and came out at the same place. My mother was driving the horse which we had since last August. I do not know how old he was. That was the first time he got scared. Q. Did you ever have him around trains before? A. We would have him close to a gate when the train came by. We have driven him to town before that on the same road, and trains came by, and he never did get scared before. My mother had hold of the reins and she fell out and I got up to get the reins, and in trying to catch the reins I fell out side-ways. Before the horse got scared he was

walking, and after he got scared he just trotted way and I went down and got him and brought him back.''

Plaintiff testified: ''The horse was riding right along until it got scared. I just seen that 224 locomotive was the only engine I saw that day. I know where the negroes live, but that was down further, quite a ways further. It blew off steam down below, pretty loud. The steam came from down below the front wheels, and was very loud. At that time our horse was pretty close to the engine, about to the table there. We could see the engine; the horse started to run, and I checked it the first time, stopped him right away. The engine went north and then came south; before he came south again he went back north. When he went back north, I just kept going, and had got pretty near to Irby's store when the engine came back, and the men were laughing, the engineer and fireman on the engine. I was going to Irby's store then. The horse ran way, I know when a horse runs. I don't know whether it ran a mile past Irby's store or how far it was. It throwed me out and ran over me, and hurt me.''

There were other witnesses who testified to facts tending to corroborate plaintiff, but we do not deem it necessary to set out their evidence.

Defendant's engineer testified: ''On January fifth last I was operating and running a switch engine here in the Poplar Bluff yards. I remember an accident that occurred down near Mr. Irby's store on that date. I was operating that switch engine at that time; the engine was headed north; we had between twenty-five and thirty cars in the train and I was backing south; and I noticed a one horse spring wagon with two ladies in it, and I presume about six car lengths before I overtaken this wagon the horse acted as though he was going to become frightened a little bit, and I shut the throttle off and the engine was coasting when I passed them, and the lady on my side raised her feet and jumped out on my side between the wheels, and the driver then raised up and jumped out on the other side. When the old lady jumped out on my

side, she raised immediately to her feet, and when she saw what the driver did, she reached in between the wheels to pick up the lines, and I shut the engine down and told the fireman to go over there and find out what happened. · The steam cocks were shut off; the throttle had a muffle pop on it, a hood that goes over the pop that prevents the steam from making a noise. Q.· That was making a noise? A. When I shut off the throttle it did. The horse was already frightened when this occurred; I never did see the horse run. When it started off it acted like it wanted to trot or something like that, but I never did see it run. Fireman J. E. Pinkley was on the engine with me at the time. He and I were not laughing about this or anything else. I said we had about twenty-five or thirty loads. That tonage was not such a load for the engine, but that morning it was kind of cool and it was working the engine pretty hard, which requires a good deal of steam. We passed by this horse only one time; the engine did not switch back and forth while this was going on. I was backing south. This accident occurred the first time I backed down after noon. In backing up I overtaken this horse and backed by it; we were backing south; the horse was ahead of the engine, and we were backing up with them. I stopped when I got the cars over the switch, the accident had already occurred then. The · horse did not pass the engine twice. I was not working steam out of the cylinder cocks at all while this horse was there; it was not necessary to do that and I wasn't doing it at that time. When this steam pops off, it does not make very much noise. There was no other kind of noise made by the engine there, no unusual noise.''

Cross-examination: ''Our engine was numbered 427, and that is the engine Pinkley was on. There is a cylinder on each side of the engine, the pilot being right ahead of the cylinder; the engine has only two cylinders. There is what we call a cylinder cock lever in the cab to either open or shut them. That causes the engine to spurt out steam down by the cylinders. When you operate that lever it permits the steam to escape there when you are

working the engine. When it is standing still it will not escape. When this cock is open when the piston operates in that cylinder it forces the steam out providing you are working steam. That lever is generally operated with my foot, it is a little short lever; and I could sit in my place and work that lever with my foot, and that would open these cylinder cocks which are placed there to let the water out which condenses in the cylinders. If too much water gets in the cylinders and condenses, we open that up and let it out. You don't have to open these cylinder cocks to operate the engine; but it is necessary to have them on there because when the engine is standing still, it gets water in there; but you can run the engine without it, and run the engine without emitting steam down by the little wheels. In operating a train that is not one of the usual noises. They make no noise unless they are open. The steam comes from the cylinders through the valves and out through the smoke stack when you are working the throttle; there is an exhaust that goes into the stack.''

The fireman testified: ''I was fireman on a switch engine here on the 1st and 4th of January, the way I got it. I remember the occasion when Mrs. Holland was hurt, and I was on the engine that day with Mr. Gamblin as engineer. We came out from dinner and were switching in the south end of the yards, we had pulled out a cut of cars there up the east track there and my engineer called me over and he says, 'Come over here.' And he showed me a woman laying in the road, and I watched this woman a few moments, and I saw a man help her up, and they walked south towards that little store. I did not see the horse and buggy until I saw the horse about 200 feet from the accident, it looked like it was tied to the fence; that was some time near ten minutes, I guess, after I saw the woman. I did not see the horse going away or anybody getting out of the buggy. I was on the left or west side of the engine which was headed north. At that time we were pulling out this cut of cars, going south. The engine was of the 400 class. We had a pretty good load for that

engine, that morning it was pretty cool, and it all depends on the weather how many cars you can pull with any engine. Q. Did you—when you pulled the cars down there, did you stop any place? A. We got out of the switch, yes. Before we saw this woman we were backing up all the time and did not stop. After the accident we went back a ways and stopped; but we had not gone down there and backed up again before that. Just before this, the engine wasn't making noises, only the exhaust of the stack pulling the cars. That happens all the time when you are working an engine; you can't work the engine at all without that happening. The cylinder cocks were not open so as to emit any steam, nor were the engineer and I laughing about anything there at the time."

Cross-examination: "The engineer opens the cylinder cocks; they are not on my side of the engine. When he opens them up the steam escapes at both sides. That isn't necessary when you are running the engine unless the boiler gets too full of water; it is not necessary to open them up to operate the train. When I say the engine was exhausting I mean the throttle was open and it was what some people call 'puffing.' I don't know that the horse ran away; I never saw it, never saw the accident. I went over to the place to make inquiry. The engineer told me to step over there and find out what I could about it. I went over and asked some old fellow, and he said he didn't know anything about it that's what I understood him to say."

Defendant contends that there is no evidence that the horse *ran away,* or that there was any *unusual* noise. Plaintiff's daughter said that the horse *trotted away,* and that she followed after him and "hollered" *whoa,* and he stopped. It may be true that the horse did not *run away* as that expression is usually understood, but there is evidence that he was running, both by plaintiff and her daughter. Witness Jackson said that "the horse was coming at a pretty peart lick, between a trot and a run." As to whether the horse ran away as that term is usually understood we do not think is wholly

214 M. A.—32

decisive. If the horse was frightened from unusual noises negligently caused by defendant's agents, and got beyond control of plaintiff, and she was thrown from the buggy and injured, then she can recover, and we do not think her recovery would depend upon the rate of speed the horse trotted or ran after being so frightened. It is also contended that plaintiff jumped out of the buggy without cause. There is evidence tending to show that she was thrown out. Such was a question for the jury.

Was there any substantial evidence of unusual noise negligently caused? Plaintiff testified that the engine "blew off steam down below pretty loud. The steam came from down below the front wheels, and was very loud." The daughter said that "the engine blew off steam, from the bottom and sides, up near the cow catcher where the two little wheels are." It would appear that the escaping steam to which plaintiff and her daughter refer came from the cylinder cocks. This would be the conclusion from their evidence when read in connection with the evidence of the engineer. Also it appears from the evidence of the engineer that it was not necessary to open these cylinder cocks while operating the engine. We think that there was sufficient evidence to take the cause to the jury. [Brown v. Railroad, 89 Mo. App. 192; Feeney v. Railroad, 123 Mo. App. 420, 99 S. W. 477; Miller v. Engle, 185 Mo. App. 558, 172 S. W. 631.]

Defendant contends that plaintiff's instruction number 1 is too broad. The evidence of plaintiff and her daughter tends to show that the horse became frightened at the noise made by the escaping steam from the cylinder cocks. There was evidence that it was not necessary to open these cocks while the engine was running. One of plaintiff's witnesses, Ed Jackson, testified that the engineer "blew the engine whistle and throwed some lever or another and throwed black smoke out." The instruction permitted recovery if it was found that those "in charge of said engine so negligently managed, controlled and ran the same as to cause said engine to again emit

a large quantity of steam, and make loud, unusual and unnecessary and terrifying noises,'' etc. Defendant says that this instruction permitted recovery on the evidence of Jackson that black smoke was thrown out. Jackson did not describe the noise that was made by the smoke being thrown out. He merely described, in this respect, what he saw. The noise he spoke of was the sounding of the whistle. Also defendant's instruction 3A told the jury that before plaintiff could recover they must find that the horse was frightened, and caused to run away ''by reason of an unusual and unnecessary noise, or by reason, of unusual and unnecessary noises, produced by steam escaping from the locomotive,'' etc. Defendant's instruction is no more definite than is plaintiff's, and if plaintiff's instruction is bad defendant cannot complain, because it has accepted or adopted the same theory. But we do not think that the jury was misled by plaintiff's instruction. The noise complained of in the evidence of plaintiff was from escaping steam down at the cylinder cocks, not from the whistle or from the exhaust.

Is the verdict excessive? Plaintiff recovered a judgment for $5000. The record shows that plaintiff is a married woman 57 years of age. Her injury consisted of a crushed ankle and three broken ribs; two on the left side and one on the right. At the time of the trial about three months after the injury plaintiff still used a crutch. Dr. A. S. Smith testified that ''the ankle was so crushed that I hardly think a woman of her age will entirely get over it, but that she will limp considerably; the ribs ought to be all right eventually. The ankle was crushed right in the joint, this bone here was crushed. . . . I hardly think it will get well after a while. . . . At her age the bones don't never heal as good.'' Very little appears in the record as to physical suffering. The physician was not definite as to the permanency of the injury. The most that can be said of her evidence is that she was not certain. In the instruction on the measure of damages plaintiff omitted the element of permanent injury. We believe that this judgment is excessive

to the extent of $1500. If, therefore, plaintiff will, within ten days from the date of filing this opinion, file here a remittitur of $1500, the judgment for $3500 will be affirmed, otherwise the judgment will be reversed and cause remanded. *Cox, P. J.,* and *Farrington, J.,* concur.